**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **THE NATIONALIST MOVEMENT,** | : | |
| | : | |
| **Plaintiff** | : | |
| | : | **CIVIL ACTION NO. 1:CV-02-1917** |
| **v.** | : | |
| | : | **(Judge Kane)** |
| **CITY OF YORK** | : | |
| | : | |
| **Defendant** | : | |

<u>**MEMORANDUM AND ORDER**</u>

Before the Court are cross motions for summary judgment.  (Doc. Nos. 38 and 50.)

Having been fully briefed and heard on oral argument, the motions are ripe for disposition.

**I.    <u>Background</u>**[1]

York Ordinance No. 10 ("York Ordinance"), adopted on April 16, 2002, amended Article

741, § 741.03 "Public meetings" of the Codified Ordinance of the City of York, Pennsylvania, to

establish a permit requirement for the use of public land and facilities in the City of York.

(Attached hereto as Appendix A.)  The York Ordinance prohibits persons from conducting any

public assembly, parade, picnic, or other event involving more than twenty-five individuals

without first obtaining a permit.  (Doc. No. 14, Ex. A, York Ordinance § (c); § 741.03(c).)[2]

Permits may be obtained by filing a written application for a permit with the Recreation and

Parks Bureau.  (York Ordinance § (d)1(1); § 741.03(d)(1)A.)  "Recreational permits" are also

available by written application with the Recreation and Parks Bureau for individuals seeking to

---

[1] The following are undisputed facts unless otherwise indicated.  (Doc. Nos. 40, 53, 59, and 64.)

[2]  The arrangement of York Ordinance No. 10 does not exactly correspond with the arrangement of Article 741 of the Codified Ordinance of the City of York, § 741.03.  For clarity, the Court will cite to both ordinances.

reserve park facilities for an event involving less than twenty-five people.  (York Ordinance § (d)1(3); § 741.03(d)(3).)  Individuals who hold an event in violation of this statute are subject to a $1,000.00 fine or 30 days imprisonment.  (York Ordinance § (g); § 741.03(j).)

In order to be considered for a permit, an applicant must first pay an application fee. (York Ordinance § (d)3; § 741.03(d)(5).)  The "Basic Permit" fee is $50.00 for city residents and $100.00 for non-residents.  (York City Council Resolution No. 56 of Session 2002, Doc. No. 14, Ex. A at 14.)  The applicant must also pay a security deposit equal to the "estimated cost of policing, cleaning up, and restoring the park", procure and maintain insurance "in such amounts and with such coverage as shall reasonably be required by the City", agree to reimburse the City for "any such costs incurred by the City" in connection with the event, and agree to "indemnify the City and hold the City harmless from any liability to any person resulting from any damage or injury occurring in connection with the permitted event proximately caused by the action of the [applicant]".  (York Ordinance § (d)4-7; § 741.03(d)(6)-(9).)  Prior to August 19, 2003, the York Ordinance also restricted the distribution of literature and the display of signs.

Permit applications are processed in order of receipt.  (York Ordinance § (e)1; § 741.03 (e)(1).)  Pursuant to section (e)5 of the Ordinance, the City may deny applications that are not fully complete, contain material falsehood, plan activities that would represent an unreasonable danger to the health, safety, or welfare of the public, or if the applicant has not complied with the section (d) requirements.  (York Ordinance § (e)5; § 741.03(e)(5).)  An application that is deficient in one of the section (d) conditions, but that otherwise complies with all other requirements, will be granted a conditional approval so long as the applicant satisfies all of the section (d) requirements prior to the event.  (York Ordinance § (e)2; § 741.03(e)(2).)  "If no

2

written denial or conditional approval is issued within fourteen days of the date on which a permit application is fully completed, executed and filed with the appropriate officer or employee . . . the application shall be deemed to have been granted a conditional approval . . . ." (York Ordinance § (e)3; § 741.03(e)(3).)  Otherwise, an applicant will receive a written notice of denial clearly specifying the grounds upon which the permit was denied.  (York Ordinance § (e)4-5; § 741.03(e)(4)-(5).)

Applicants may apply to the Solicitor's Office for a waiver of the user fee, security deposit, or certificate of insurance if "the activity is protected by the First Amendment of the Untied States Constitution and the requirement would be so financially burdensome that it would preclude the applicant from using Park property for the proposed activity." (York Ordinance § (f)3; § 741.03(f)(3).)  If no written denial of waiver is issued within fourteen days, the waiver is deemed approved.[3]  (Id.)  Any application denied by the City or waiver denied by the Solicitor's Office may be appealed to the Recreation Director who, within seven days, must affirm, modify, or reverse the denial.  (York Ordinance § (f)1; § 741.03(f)(1).)

On or about June 14, 2002, the Nationalist Movement ("Plaintiff") submitted an application for a permit to hold a protest of the Martin Luther King, Jr. holiday, in and around York City Hall, on January 20, 2003.  On its application, Plaintiff objected to several of the provisions of the York Ordinance, including, inter alia restrictions on distribution of literature, restrictions on the display of signs, the required security deposit, the indemnification agreement, the permit fee, and the payment of police and public work services costs.  (Doc. No. 14, Ex E.)

---

[3] However, even if a waiver of the user fee is issued, the applicant may have to retroactively pay the user fee if the applicant raises sufficient funds during the event.  (York Ordinance § (f)3.)

In protest of the permit fee, Plaintiff did not submit any form of payment for fees or costs required by the application.

By letter dated July 12, 2002, Defendant's Assistant City Solicitor notified Plaintiff that the permit application was being denied as incomplete and for failure to comply with the York Ordinance.  On or about July 15, 2002, Plaintiff appealed the denial.  On July 25, 2002, Defendant's Director of Public Works affirmed the denial.  Thereafter, Plaintiff requested that Defendant's City Council entertain a further appeal.  Plaintiff's request was denied.

On August 2, 2002 (Doc. No. 14, Ex. L) and September 3, 2002 (Doc. No. 14 Ex. P), Plaintiff wrote to Defendant requesting a waiver form excusing Plaintiff from paying the application fee.  Plaintiff received no response from Defendant to either request for a fee waiver. On October 25, 2002, Plaintiff initiated the instant civil action by filing a Complaint grounded in the First, Fifth and Fourteenth Amendments and for declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.  (Doc. No. 1.)  On January 03, 2003, Plaintiff filed a motion to dismiss the Complaint.  (Doc. No. 11.)  The same day, Plaintiff filed a motion for a temporary restraining order and a preliminary and permanent injunction.  (Doc. No. 12.)  By Order dated January 10, 2003, the Court scheduled an injunction hearing for January 13, 2003.  (Doc. No. 20.)  However, prior to the scheduled hearing, Defendant agreed that Plaintiff could hold its event on January 20, 2003 without obtaining a permit and agreed to provide police protection and electricity, for the nominal fee of $1.  (Doc. No. 21.)  Defendant did not concede any defect in the Ordinance, but represented to the Court that the Ordinance was inapplicable because Plaintiff's gathering was too small.  Pursuant to the agreement, Defendant withdrew its motion to dismiss and Plaintiff withdrew its motion for a temporary restraining order.  The parties thereafter reported to the

Court that Plaintiff's event was held without incident and that fewer than twenty-five people attended Plaintiff's rally.

On August 19, 2003, Defendant amended the York Ordinance, deleting the provisions restricting the circulation of papers and the display of signs.  On May 5, 2003, with the permission of the Court, Defendant filed a motion to "Enforce Settlement Agreement or, in the alternative, Motion to Dismiss".  (Doc. No. 29.)  By Order dated March 23, 2004, the Court denied Defendant's motion.

## II.     Standard of Review

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; White v. Westinghouse Elec. Co., 862 F.2d 56, 59 (3d Cir. 1988).  A factual dispute is material if it might affect the outcome of the suit under the applicable law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 249.  The evidence presented must be viewed in the light most favorable to the non-moving party.  Id.  "The inquiry is whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one sided that one party must, as a matter of law, prevail over the other."  Id.  This standard does not change by virtue of cross-motions being presented.  United States v. Hall, 730 F. Supp. 646, 648 (M.D. Pa. 1990).

The moving party has the initial burden of identifying evidence that it believes shows an

5

absence of a genuine issue of material fact.  Childers v. Joseph, 842 F.2d 689, 694 (3d Cir.

1988).  Once the moving party has shown that there is an absence of evidence to support the non-

moving party's claims, the non-moving party may not simply sit back and rest on the allegations

in the complaint.  Instead, the non-moving party must "go beyond the pleadings and by [its] own

affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate

specific facts showing that there is a genuine issue for trial."  Celotex Corp. v. Catrett, 477 U.S.

317, 324 (1986).  The evidence must be viewed in the light most favorable to the non-movant.

See Groman v. Township of Manalapan, 47 F.3d 628, 633 (3d Cir. 1995).  Summary judgment

should be granted where a party "fails to make a showing sufficient to establish the existence of

an element essential to that party's case and on which that party will bear the burden at trial."

Celotex, 477 U.S. at 322.

With respect to the sufficiency of the evidence that the nonmoving party must provide, a

court should grant summary judgment where the nonmovant's evidence is merely colorable,

conclusory or speculative.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986).  There

must be more than a scintilla of evidence supporting the nonmoving part and more than some

metaphysical doubt as to the material facts.  Id. at 252; Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 586 (1986).

## III.    Discussion

Plaintiff alleges that the York Ordinance violates the First Amendment of the United

States Constitution, facially and as applied.  Plaintiff also claims that Defendant violated its right

to due process and equal protection under the law in not ruling on its request for a waiver of fees.

Both parties seek summary judgment in their favor on all counts of the Complaint.  The Court

will address each claim in turn.

### A.      Plaintiff's First Amendment Challenge

The First Amendment of the United States Constitution protects speech and other expressive activity in public places, or "government fora," although the degree of protection depends upon the type of forum at issue.  Kreimer v. Bureau of Police, 958 F.2d 1242, 1255-56 (3d Cir. 1992).  The Supreme Court has identified three types of fora: traditional public fora; designated public fora; and nonpublic fora.  Arkansas Educ. Television Comm'n v. Forbes, 523 U.S. 666, 677 (1998).  Traditional public fora consist of streets, parks and public sidewalks long considered as places for public assembly and the communication of ideas.  Kreimer, 958 F.2d at 1261.  Designated public fora are areas the government has specified for First Amendment activities.  Included in this group are "limited public fora," property designated by the government for the exercise of some forms of First Amendment activity, but not all.  Id. Nonpublic fora are places "which are not by tradition or designation [fora] for public communication . . . ."  Id. at 1255-56 (brackets in original) (quoted case omitted).  This third group is the government equivalent of private property.  Id. at 1256.

For traditional fora and designated fora, government regulation of First Amendment activities is subject to higher judicial scrutiny than regulation in nonpublic fora.  Id.  In these areas, prior restraint of First Amendment activity is constitutional only if the regulation does not "delegate overly broad licensing discretion to a government official," Forsyth County v. Nationalist Movement, 505 U.S. 123, 130 (1992), is "justified without reference to the content of the regulated speech, . . . [is] narrowly tailored to serve a significant governmental interest, and . . . leave[s] open ample alternative channels for communication of the information" Ward v. Rock

Against Racism, 491 U.S. 781, 791 (1989) (quoted cases omitted).  The same standard applies to regulation in limited public fora for First Amendment activities either permitted in that area or consistent with permitted activities.  Kreimer, 958 F.2d at 1262.   Otherwise, regulation of First Amendment activities in limited public fora and nonpublic fora need only be reasonable and not an effort to suppress communication based on the speaker's view.  Id. at 1256, 1262.

Plaintiff attempts to distinguish the public streets surrounding a city hall from all other governmental fora, arguing that the former "comprise[s] the 'quintessential,' 'classic' public forum" and should therefore be "accorded the utmost protection."  (Doc. No. 65 at 8.) Regulation of First Amendment activity on public streets is subject to the highest form of review under Forbes.  The Court finds no legal basis for the proposition that a fourth, higher form of governmental fora need be created to protect the area directly surrounding a city or municipal hall.  Accordingly, the Court will conduct its review of the York ordinance pursuant to the traditional fora analysis.

1.    Facial Challenge

Plaintiff argues that the York Ordinance runs afoul of the First Amendment on its face because it requires an application fee, a security deposit, and insurance coverage prior to approval, and grants the city officials undue discretion in determining the amount of each of the above.  Plaintiff also objects to the indemnification requirement, arguing that the hold-harmless provision makes speech, and especially controversial speech, available only to those individuals wealthy enough to assume the risk of liability.

The Supreme Court has long held that a state may require, as a prerequisite to engaging in expressive activity on public land, that a permit applicant pay fees to defray government costs

directly attributable to the speech activity.  Cox v. New Hampshire, 312 U.S. 569 (1941).  The

Court has reasoned that such costs are allowable because the government has a substantial

interest in "coordinating multiple uses of limited space" that implicates an applicant's interest in

the use and enjoyment of that space.  Thomas v. Chicago Park District, 534 U.S. 316, 323

(2002).  The Cox Court upheld a fee that ranged from "$300 to a nominal amount" and that was

intended "to meet the expense incident to the administration of the [licensing] act and to the

maintenance of public order in the matter licensed." 312 U.S. at 576-77.  However, courts have

since struck down permit schemes that grant city officials too broad a degree of discretion during

the application approval process or in setting fee amounts.  See Forsyth County, 505 U.S. at

131-33 (invalidating permit fee requirement because of the unbridled discretion granted to the

county administrator).

In Forsyth County v. Nationalist Movement, the Supreme Court noted that an ordinance

requiring a permit and a fee as a precondition to authorizing speaking, parades, or assemblies in a

public forum is formally a prior restraint on speech and that there is a "heavy presumption"

against the validity of a prior restraint.  505 U.S. at 130.  Notwithstanding this presumption, the

Forsyth Court recognized that permit and fee requirements may be imposed by the government in

order to regulate competing uses of public forums, so long as the government officials do not

have overly broad discretion in determining when to apply the fee and in what amount.  Id.

Recently, in Thomas v. Chicago Park, the Supreme Court upheld an ordinance that

required a person to obtain a permit in order to "conduct a public assembly, parade, picnic, or

other event involving more than fifty individuals," or engage in an activity such as "creating or

emitting any Amplified Sound" on public land.  534 U.S. at 318.  The permit statute in Thomas

9

was substantially similar to that challenged in this case, as were the specified grounds for

rejection of a permit under the Chicago ordinance.  Compare Thomas, 534 U.S. at 318-19, 319

n.1 with York Ordinance § (e)5 (§ 741.03(e)(5)).  The Supreme Court noted that:

> the object of the permit system (as plainly indicated by the
> permissible grounds for permit denial) is not to exclude
> communication of a particular content, but to coordinate multiple
> uses of limited space, to assure preservation of the park facilities,
> to prevent uses that are dangerous, unlawful, or impermissible
> under the Park District's rules, and to assure financial
> accountability for damage caused by the event.

Id. at 322.  However, in assessing the appropriateness of the permitting scheme as a time, place,

and manner regulation, the Supreme Court opined that "even content-neutral time, place, and

manner restrictions can be applied in such a manner as to stifle free expression" where the

licensing official enjoys unduly broad discretion in determining whether to grant or deny a

permit.  Id. at 323 (citing Forsyth, 505 U.S. at 131).

It is well established that a permit scheme regulating the time, place, and manner of

speech will be upheld so long as the ordinance: (1) does not "delegate overly broad licensing

discretion to a government official," (2) is content-neutral, (3) is narrowly tailored to serve a

significant governmental interest, and (4) leaves open ample alternatives for communication.

Forsyth, 505 U.S. at 130; Wade v. Rock against Racism, 491 U.S. 781, 790-791 (1989).  Thomas

instructs that, with regard to this first prong, a permit scheme must also contain adequate

standards to guide the licensing official's decision and provide for effective judicial review.  Id.

A regulation is "narrowly tailored if it targets and eliminates no more than the exact

source of the 'evil' it seeks to remedy." Frisby v. Schultz, 487 U.S. 474, 485 (1998) (quoting

City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 808 (1984)).  The

10

ordinance need not be the least restrictive means available, merely "not substantially broader than necessary to achieve the government's interest." Id.  The "essence of narrow tailoring" is that the ordinance must "focus[] on the source of the evils the city seeks to eliminate . . . and eliminate[] them without at the same time banning or significantly restricting a substantial quantity of speech that does not create the same evils." Id. at 800 n.7.

A.    Permit Fee

In the instant matter, the York officials have no discretion with regard to the permit fee, as the nominal fee for a basic permit is fixed at $50 for city residents and $100 for non-residents. (York Ordinance, Resolution No. 56, Fee Schedule.)  Different fees apply for use of certain city facilities within park grounds, but these fees are fixed based upon the facility reserved and the number of people attending, not based upon the purpose of the event or content of the message. Id.  Unlike the permit fee system that the Supreme Court found unconstitutional in Forsyth, the instant user fee is not variable so as to allow for discretionary abuse by city officials.  Forsyth, 505 U.S. at 134-36.  Moreover, under section (f) subsection 3 of the York Ordinance, the city must waive the permit fee upon a showing that the fee would "be so financially burdensome that it would preclude the applicant from using Park property for the proposed activity." (York Ordinance § (f)3; § 741.03(f)(3).)  If the applicant provides objective evidence of an inability to pay, the ordinance provides city officials no discretion in deciding when to apply the waiver. Because the nominal user fee leaves no discretion to the official, does not base the amount charged on the content of the message, is narrowly tailored to allow the city only to recover the incidental cost of processing the application, and makes provisions for groups unable to pay, the user fee does not facially violate the First Amendment.  Forsyth, 505 U.S. at 130.  Accordingly,

11

Defendant's motion for Summary Judgment on this claim will be granted.

     B.  Insurance and Security Deposit Requirements

  The York Ordinance requires applicants, as a prerequisite to obtaining a permit, to pay a security deposit in an amount "in accordance with the schedule of fees set by the Recreation Director and approved by City Council.  The amount of the security deposit set in the schedule of fees shall be equal to the estimated cost of policing, cleaning up, and restoring the park upon the conclusion of the use or activity."  (York Ordinance § (d)5; § 741.03(d)(7).)  Similarly, applicants must procure insurance "in such amounts and with such coverages as shall reasonably be required by the City . . . .  The amounts and type of insurance required shall be determined by the Public Works Department, based upon the nature of the activity and the risk involved" and will be listed in a "uniform schedule of insurance guidelines for particular types of activities."  (York Ordinance § (d)7; § 741.03(d)(9).)  On April 16, 2002, the City Council of York adopted a schedule of fees as required by the York Ordinance.  (York City Council Resolution No. 56 of Session 2002, Doc. No. 14, Ex. A at 14.)  This schedule of fees establishes the application permit fee, classifies the City park property, and provides that "[a]pplicants shall also be responsible for all charges incurred for Police, Fire, and Public Works services for all permits issued.  A security deposit equal to the estimate cost of Policing [sic], clean up, and restoring the park is required in advance of the event . . . ."  (Id.)  The record contains no further guidelines specifying how this estimate is calculated or any guidelines as to the amount and type of insurance required.

  A permit licensing official may not have "unduly broad discretion" in determining whether to grant or deny a permit.  Thomas, 534 U.S. at 321 (citing Forsyth, 505 U.S. at 131).  Rather, the regulation must contain "adequate standards" to guide the official's decisions.  Id.  In

its papers, Defendant relies heavily upon the holding of <u>Thomas v. Chicago Park</u>, as the York

Ordinance closely mirrors the Chicago ordinance upheld by the Supreme Court.  (<u>Compare</u> Doc.

No. 14 Ex. A <u>with</u> Doc. No. 60 Ex. 1.)  In fact, the structure and language of the two ordinances

are nearly identical.  Both ordinances require an application fee, facility fee, security deposit,

indemnification agreement, and insurance prior to approval of the permit.  Both ordinances also

provide procedures for review and the waiver of the user fee, security deposit, and/or certificate

of insurance.  However, unlike the York Ordinance, the Chicago Ordinance contains a schedule

of fees establishing guidelines for the amount of insurance required, setting the insurance amount

on the size of the event and the nature of the facilities involved.  <u>Thomas v. Chicago Park</u>

<u>District</u>, 227 F.3d 921, 925 (7th Cir. 2000) ("Thomas II").

Moreover, the appellants in <u>Thomas</u> did not challenge the provisions of the Chicago

ordinance that required fees, insurance, indemnity, and a security deposit prior to approval of the

permit, nor did the <u>Thomas</u> court directly address these provisions of the Chicago ordinance.  <u>See</u>

Petition for Writ of Certiorari, <u>Thomas v. Chicago Park Dist.</u>, 2001 WL 34091941 (February 1,

2001).[4]  Contrary to Defendant's reliance, the <u>Thomas</u> court did not ratify each and every

provision of the Chicago Ordinance, thus rendering any ordinance that mirrors it immune from

constitutional attack.

This notwithstanding, the Supreme Court does cite approvingly the government's

legitimate interest in "assur[ing] financial accountability for damage caused by the event."

<u>Thomas</u>, 534 U.S. at 780.  Moreover, in the underlying decision affirmed by the Supreme Court

---

[4] The <u>Thomas</u> Court focused on the local official's discretion to grant or deny
applications under the Chicago ordinance.

in <u>Thomas</u>, the Seventh Circuit Court of Appeals upheld the Chicago ordinance's insurance

requirement because:

> the amount of insurance required is not based on, or . . . influenced
> by, the nature of the event, and specifically by whether it involves
> controversial expressive activity likely to incite violence by
> onlookers or opponents.  The required amount and the cost of the
> insurance depend only on the size of the event and the nature of the
> facilities involved in it (a bandstand, stage, tents, and so forth).

<u>Thomas II</u>, 227 F.3d at 925.  Similarly, the Ninth Circuit Court of Appeals found no First

Amendment violation where a park required applicants to post a bond for liability insurance to

cover equipment damage or liability resulting from the planned event's "unanticipated effects"

on event attendants, because:

> [t]he bond requirement is content-neutral in that it is applied to
> every applicant regardless of the nature of the expression or
> content of the message they wish to convey.  It furthers a
> significant governmental interest: the protection and maintenance
> of an expensive sound system.  It is narrowly tailored to meet that
> goal by requiring most applicants to post the bond.  Finally, the
> bond requirement does not completely close off an applicant's
> opportunities for expressive activity; an applicant who cannot
> afford to or does not want to post the bond may conduct many
> other types of expressive activity in the park.

<u>Gerritsen v. City of Los Angeles</u>, 994 F.2d 570, 578-79 (9th Cir. 1993), cert. denied, 510 U.S.

915 (1993).

In an unpublished opinion applying the <u>Thomas</u> analysis to a Harrisburg city ordinance

governing the use of the city's parks, the Third Circuit Court of Appeals found:

> the City has a substantial interest in ensuring that the public's
> health, welfare, safety or enjoyment of the park will not be
> compromised by a proposed use of the park.  Accordingly, any
> proposed event that might result in violence, criminal activity or
> disorderly conduct should be denied a permit, as should any event

14

> which poses extraordinary, burdensome financial obligations on
> the City of Harrisburg.

Diener v. Reed, 77 Fed. Appx. 601, 607 (3d Cir. 2003).  The Third Circuit upheld the Harrisburg

ordinance's permit scheme as content-neutral time, place, and manner restrictions narrowly-

tailored to serve a significant governmental interest.  The Court also rejected the as-applied

challenge to the provisions because it found the "exclusion of Appellants . . . [was] content-

neutral, based on their behavior, not the content of their speech."  Id. at 609.[5]  As distinguished

from the ordinance upheld in Diener, the York Ordinance does not establish a security deposit

schedule and provides no guidance in calculating the prerequisite insurance coverage, nor what

factors Defendant should consider when determining the amounts required.

Unlike the ordinance challenged in Thomas, the York Ordinance is not replete with

guidelines calculating the insurance requirement based upon the size of the event and the nature

of the facilities involved.  227 F.3d at 925.  Instead, York officials are vested with the unbridled

discretion to set the insurance requirement and security deposit based upon the content of the

message or their own opinions about the speaker.  The statute contains no guidelines as to the

amount and type of insurance converge required, leaving such a determination wholly up to the

city official's discretion.  The Ordinance requires the Public Works Department to prepare "a

uniform schedule of insurance guidelines for particular types of activities", yet the record

contains no such schedule.  Unlike the Chicago Ordinance wherein a schedule established

insurance requirements "only on the size of the event and the nature of the facilities involved in

---

[5] Here again, the Appellate Court upheld the official's discretionary power as it applied to granting or denying the permit, but did not directly address the constitutionality of the fiscal prerequisites at issue here.

it[,]" York officials are free to base the insurance requirement on the group's reputation.  Thomas II, 227 F.3d at 925.

Without specific guidelines calculating the insurance and deposit requirements using content-neutral factors, thereby limiting the scope of the city officials' discretion, these provisions contain "the possibility of censorship through uncontrolled discretion." Id. at 133.  In fact, Defendant admits that city officials base these figures upon the reputation of the speaker. (Oral Argument Transcript at 46-7.)[6]  The Supreme Court has routinely held that "[r]egulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment."  Forsyth, 505 U.S. at 135 (citing Regan v. Time, Inc., 468 U.S. 641, 648-649 (1984); Simon & Schuster, Inc. v. Members of N. Y. State Crime Victims Bd., 502 U.S. 105, 116, (1991); Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 230 (1987)).  Without content-neutral guidelines limiting city officials' discretion in this regard, the York Ordinance allows the city to unconstitutionally "charg[e] a premium in the case of a

---

[6] The practical effect was explained by Defendant during oral argument.  Counsel for Defendant represented to the Court that "the amount of the security deposit is set and should equal to the estimate cost of policing, cleaning up, and restoring the park upon the conclusion of the use or activity." (Oral Argument Transcript at 46 ¶¶ 16-19.)  Defendant conceded that it examines the nature of the event, rather than the mere size of the event or the facilities intended to be used, in determining the cost of the deposit on the theory that certain events require more police presence.  The Ordinance offers no objective standard by which such an assessment might be made.  Anticipatory cleanup costs and police estimates under the York Ordinance appear to be based merely upon the city's estimation of an applicant's reputation and the unpopularity of the group's message. (Oral Argument Transcript at 46.)  If York officials assume that unpopular organizations will inherently require a higher police presence and greater cleanup costs, as counsel suggests, then speakers with unpopular messages will be required to deposit much more money prior to speaking than groups with better "reputations". (Oral Argument Transcript at 46-7.)  This content based scheme not only grants broad discretion to city officials, but also threatens to dissuade unpopular groups from utilizing traditional public forums by placing a premium on -- what the city views as -- unpopular speech.

controversial political message delivered before a hostile audience."  Forsyth, 505 U.S. at 136.

Accordingly, Article 741 of the Codified Ordinances of the City of York, Pennsylvania, Section

741.03, subsection (d)5 and subsection (d)7 -- the insurance and security deposit provisions -- are

facially unconstitutional and cannot be enforced.  Therefore, Plaintiff's motion for summary

judgment with regard to these claims will be granted.

C.     Indemnification and Reimbursement Agreement

In addition to requiring proof of insurance and a security deposit, the York Ordinance

further requires applicants to sign an indemnification and reimbursement agreement, wherein:

> the applicant shall promise and covenant to bear all costs of
> policing, cleaning up, and restoring the park upon conclusion of the
> event or activity; to reimburse the City for any such costs incurred
> by the City; and to indemnify the City and hold the City harmless
> from any liability to any person resulting from any damage or
> injury occurring in connection with the permitted event
> proximately caused by the action of the permittee, the sponsoring
> organization, its officers, employees or agents or any person under
> their control insofar as permitted by law.

(York Ordinance § (d)4; § 741.03(d)(6).)  Within the application itself, the applicant must sign

and agree, inter alia:

> to reimburse the City of York for any additional costs of clean-up
> and restoration of the park upon conclusion of the event described
> above [and] to indemnify and hold the City of York harmless from
> any liability to any person resulting from any property damage or
> personal injury occurring in connection with the event caused by
> the applicant or the sponsoring organization, its officers,
> employees, or any person under its control.

(Doc. No. 14, Ex. E.)  This provision mirrors that of the Chicago Ordinance.  (See Doc. No. 60,

Ex. 1.)

A municipality has a legitimate interest in "assur[ing] financial accountability for damage

17

caused by [an] event" on public land, and may enact content-neutral time, place, and manner regulations narrowly tailored to serve this interest.  Thomas, 534 U.S. at 779-80.  "'To allow unregulated access to all comers could easily reduce rather than enlarge the park's utility as a forum for speech.'"  Id. at 780 (quoting Thomas II, 227 F.3d at 924.)  Accordingly, the City of York has a legitimate interest in limiting liability caused by the actions of event organizers and seeking reimbursement for damage to park grounds and facilities.

Unlike other indemnity provisions which have been struck down by lower courts, the York Ordinance's hold-harmless provision does not include injury resulting from the actions of counter-demonstrators, thereby allowing a heckler's veto.[7]  See Van Arnam v. General Services Administration, 322 F. Supp. 2d 376, 395-407 (D. Mass 2004) (finding unconstitutional a hold-harmless provision indemnifying the government from "any and all loss, damage, claim or liability whatsoever . . . directly or indirectly due to the exercise by the licensee" of the permit).  Instead, the indemnification agreement indemnifies only those injuries proximately caused by the actions of the applicant.  Thus, applicants with unpopular messages have no more risk under this provision than a speaker with popular views.

There is nothing in the record to support a finding that York officials are enforcing the reimbursement agreement differently based upon the content of the speech.  Unlike estimated costs calculated before the event, which without adequate standards could be applied so as to stifle unpopular speech, the above provision requires reimbursement of only those actual costs incurred by the municipality in connection with the event.  (York Ordinance § (d)4; §

---

[7] Under Pennsylvania law, hold-harmless provisions are strictly construed against the party seeking their protection and limited in scope to matters expressly covered therein.  Fulmer v. Duquesne Light Co., 543 A.2d 1100, 1103 (Pa. Super. 1988).

741.03(d)(6).)

The reimbursement and hold-harmless provision does not, on its face, restrict, inhibit, or discourage free speech in public forums.  The provision does not grant the city officials broad discretion, is content-neutral, and is narrowly tailored to achieve the significant government interests of protecting public property while reasonably shielding the city from liability.  Accordingly, Defendant's motion for summary judgment with regard to this claim will be granted.

E.      Severability

When a federal court is called upon to invalidate a local ordinance, the severability of the constitutional portions of the ordinance are governed by state law, here the law of Pennsylvania. City of Lakewood v. Plain Dealer Pub. Co., 486 U.S. 750, 772 (1988); Contractors Assn. of Eastern PA., Inc. v. Philadelphia, 6 F.3d 990, 997 (3d Cir. 1993).  Generally, the severability of a statute is a question of legislative intent as to the specific provision.  Rappa v. New Castle County, 18 F.3d 1043, 1072 (3d Cir. 1994).   Pennsylvania law favors severability.  Contractors Assn. of Eastern Pa. v. City of Philadelphia,   6 F.3d 990, 997 (3d Cir. 1993).  Pennsylvania has a general severability statute that reads:

> The provisions of every statute shall be severable. If any provision of any statute or the application thereof to any person or circumstance is held invalid, the remainder of the statute, and the application of such provision to other persons or circumstances, shall not be affected thereby, unless the court finds that the valid provisions of the statute are so essentially and inseparably connected with, and so depend upon, the void provision or application, that it cannot be presumed the General Assembly would have enacted the remaining valid provisions without the void one; or unless the court finds that the remaining valid provisions, standing alone, are incomplete and are incapable of

19

being executed in accordance with the legislative intent.

1 Pa. Const. Stat. Ann. § 1925 (Supp. 2005).  Additionally, there is a presumption in favor of

severability where, as here, the ordinance contains a specific severability provision.  <u>Contractors</u>

<u>Assn. of Eastern Pa.</u>, 6 F.3d at 997.  The York Ordinance's severability provision provides in

pertinent part that "[i]f any provision of this ordinance or the application thereof to any person or

circumstance be held invalid, the remainder of this ordinance and the application of such

provision to other persons or circumstances shall not be affected thereby."  (York Ordinance §

(h).)

Equipped with these principles, the Court must decide whether the York Ordinance's

provisions "are distinct and not so interwoven as to be inseparable."  <u>Saulsbury v. Bethlehem</u>

<u>Steel Co.</u>, 196 A.2d 664, 666 (1964).  The Court does not find that the unconstitutional

provisions are inseparable from the ordinance as a whole.  These provisions are merely

independent prerequisites to final approval of a permit.  The unenforceability of these sections do

not affect the city's power to enforce the remainder of the permit scheme.  Subsections (d)5 and

(d)7 of the York Ordinance (subsections (d)(7) and (d)(9) of § 741.03) are severable from the

remainder of the ordinance.  Accordingly, the statute remains enforceable except for the

provisions found unconstitutional herein.

2.      <u>As-applied Challenge</u>

Plaintiff argues that Defendant's application of the statute with regard to Plaintiff violated

its First Amendment rights.   Plaintiff alleges that Defendant is hostile towards its organization

and denied its permit due to the content of the planned event and the nature of the organization.

In support thereof, Plaintiff offers two affidavits by individual supporters testifying on the

adverse political climate in the City of York.  (Doc. Nos. 62-63.)  Plaintiff states, without citation

or reference to the record, that "City officials had made their opposition to 'racism' clear through

pronouncements and involvement in the York Unity events, including a rally at City Hall."  (Doc.

No. 64 at 3.)  Moreover, Plaintiff contends, without citation or reference to the record, that "Mr.

Musso, author of the measure, has stated that the law was promulgated specifically run out of

town [sic] those whose speech and beliefs he disagreed with."  (Doc No. 39 at 14.)  Plaintiff

offers two letters, dated August 2, 2002 (Doc. No. 14, Ex. L) and September 3, 2002 (Doc. No.

14 Ex. P), allegedly sent to Defendant wherein Plaintiff requests waiver forms.  Plaintiff argues

that Defendant's refusal to respond to these letters or provide the requested waiver forms

demonstrates an animus towards the organization.  (Doc. No. 39.)

    Plaintiff neglects to report that it refused to pay the basic permit fee and it was for this

reason that its permit was denied.  (Plaintiff's Application, Doc. No. 14, Ex. E.)  The notations

written on the permit application and correspondences sent to Defendant by Plaintiff's counsel

clearly indicate a refusal to pay the administrative fee required of all applicants.  (Doc. No. 14,

Exs. E, F, and G.)  Failure to pay the permit fee is one of the enumerated grounds for denial of

the application.  (York Ordinance § (e)5(2); § 741.03(e)(5)(B).)  The record is clear that

Defendant's requests for a waiver form were sent only after the application had been denied and

its appeal denied.  The Court finds no evidence of record that other organizations similarly

situated were treated more favorably than Plaintiff.[8]  Defendant's denial of Plaintiff's application

---

[8] A court should "generally not invalidate a waiver provision for overly broad discretion
unless and until there is a showing of a pattern of unlawful favoritism.  To do otherwise would
have the unintended effect of restricting more speech because [the municipality] could not relax
its permitting rules to increase access to the forum.  A rigid application of the permitting scheme
would prevent any group with an emergent need, or any speaker with the inability to pay the

was based upon constitutionally enforceable provisions of the York Ordinance and was content-neutral, based on lawful procedure, not the content of Plaintiff's speech.   Similarly, Plaintiff puts forth no evidence that Defendant has ever used the indemnity provision to protect itself, let alone applied the provision differently to different groups based upon the content of their message. Accordingly, Defendant's motion for summary judgment regarding the as-applied claims will be granted.

### B.     Equal Protection

While the Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike," City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985), the Supreme Court has clarified that "equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purposes for which the classification is made." Baxstrom v. Herold, 383 U.S. 107, 111 (1966); Walters v. City of St. Louis, 347 U.S. 231, 237 (1954).  Further, the "Equal Protection Clause requires that statutes affecting First Amendment interests be narrowly tailored to their legitimate objectives." Police Dep't of the City of Chicago v. Mosley, 408 U.S. 92, 101 (1972).

Plaintiff argues that the York Ordinance's fee scheme violates the Fourteenth Amendment to the United States Constitution, in that the ordinance "sets up a classification for the enjoyment of constitutional rights - those who can afford to pay versus those who cannot . . . . [and] differentiate[s] between 'residents' and 'non-residents' in its license fees."  (Doc. No. 39 at 12.)  Plaintiff's Equal Protection claims are functionally identical to its First Amendment claims

---

permit fee, to use [public land] for speech activities.  It is undoubtedly preferable to allow some flexibility in the name of increasing the exercise of protected speech." Parks v. Finan, 385 F.3d 694, 700 (6th Cir. 2004) (internal quotation marks omitted).

against the same provisions of the York Ordinance.  As the Third Circuit recently opined in <u>Hill</u>

<u>v. City of Scranton,</u>

> "it is generally unnecessary to analyze laws which burden the exercise of
> First Amendment rights by a class of persons under the equal protection
> guarantee, because the substantive guarantees of the [First] Amendment
> serve as the strongest protection against the limitation of these rights."  If a
> law passes muster under the First Amendment it is also likely to be upheld
> under the Equal Protection clause.  Likewise, if a law violates First
> Amendment rights there is no need to resort to the Equal Protection clause
> to redress the constitutional violation.

411 F.3d 118, 126 (3d. Cir. 2005) (quoting Ronald Rotunda & John Nowak, 3 Treatise on

Constitutional Law: Substance and Procedure § 18.40, at 796 (3d ed. 1999) (internal citations

omitted); <u>see</u> <u>also</u> <u>San Filippo v. Bongiovanni</u>, 30 F.3d 424, 430 n.6 (3d Cir. 1994) (where the

Third Circuit followed the same approach but did not provide an explanatory discussion because

in that case "the parties agree[d] that the analysis is the same under the first amendment and

equal protection claims").

For the reasons discussed above, this Court finds that the York Ordinance's user fee

scheme does not violate the First Amendment on its face.  The nominal permit fee reimburses the

city for the incidental cost of processing the application.  Moreover, the de minimis reduction in

that fee for city residents furthers the legitimate government purpose of encouraging city

residents to hold events locally within the city.  Further, city residents already fund the York

recreational department through the taxes they pay.  Accordingly, upon careful review of the

ordinance fee structure, the Court finds no violation of the constitutional guarantee of equal

protection under the law.

To the extent that Plaintiff also alleges that Defendant violated its rights to due process

and equal protection in applying the fee scheme – that is to say, Defendant allegedly waives fees for favored speakers but denies such waivers for disfavored speakers, such as Plaintiff – this claim is identical to Plaintiff's First Amendment as-applied claim.  (Doc. No. 39 at 12.)  A finding that Defendant ignored Plaintiff's waiver requests in order to prevent the group from conducting a rally would demonstrate a First Amendment violation and invalidate the provision. If the finder of fact found that Defendant did not violate the ordinance's waiver procedure with respect to Plaintiff's request so as to trigger a First Amendment violation, then Plaintiff would have received all the process due under the Fourteenth Amendment.[9]  Hill, 411 F.3d at 126.   As discussed more fully in the First Amendment section above, Plaintiff puts forth no evidence demonstrating that other organizations who also refused to tender the permit fee were treated more favorably than Plaintiff.  Accordingly, Defendant's motion for summary judgment in this regard will be granted and Plaintiff's Equal Protection and Due Process claims will be dismissed.

### C.     Void for Vagueness

Plaintiff argues that the York Ordinance violates the Fourteenth Amendment because it lacks "sufficient definiteness" so as to allow "those seeking to speak in the public forum to know whether they risk criminal sanctions."  (Doc. No. 39 at 12-13.)  Plaintiff's terse two sentence argument for summary judgment on this claim fails to indicate which provisions of the York Ordinance suffer from vagueness.  In Count III of the Complaint, Plaintiff alleges that the ordinance provisions requiring insurance, imposing fees, and establishing the procedures for application approval are unconstitutionally vague.  (Doc. No. 1 at 30-1.)

---

[9] Moreover, pursuant to the Local Agency Law, 2 Pa. Cons. Stat. Ann. § 752, et seq., Plaintiff was entitled to a second review of his denial by the state courts, an avenue Plaintiff chose not to pursue.

The permit and facility fee scheme contains fixed amounts for the different available

permits in a format easily understood by the average applicant.  (York Ordinance, Resolution No.

56, Fee Schedule.)  Similarly, the ordinance clearly lists the grounds upon which the city may

deny an application and the procedure for review.  (York Ordinance §§ (e)-(f); § 741.03(e)-(f).)

With regard to the insurance and security deposit requirements, Plaintiff's claims again mirror

those claims already brought pursuant to the First Amendment.  Accordingly, Defendant's

motion for summary judgment in this regard will be granted and Plaintiff's claim that the York

Ordinance is void for vagueness will be dismissed.

### D.      Overbreadth

In Count IV of the Complaint, Plaintiff argues that the York Ordinance is

unconstitutionally overbroad.  (Doc. No. 1 at 31-32.)  A regulation is unconstitutional on its face

on overbreadth grounds "where there is 'a likelihood that the statute's very existence will inhibit

free expression' by ' inhibiting the speech of third parties who are not before the Court.'"  Saxe

v. State College Area Sch. Dist., 240 F.3d 200, 214 (3d Cir. 2001) (quoting Members of City

Council v. Taxpayers for Vincent, 466 U.S. 789, 799 (1984)).  In order to render a law

unconstitutional, "the overbreadth must be 'not only real but substantial in relation to the statute's

plainly legitimate sweep.'"  Saxe, 240 F.3d at 214 (quoting Broadrick v. Oklahoma, 413 U.S.

601, 615 (1973)).  In Lakewood v. Plain Dealer Publ'g Co., 486 U.S. 750, 751, (1988), the

Supreme Court set forth a two-part test governing when a First Amendment facial challenge may

be made to an allegedly overbroad licensing scheme.  First, the regulation must confer upon a

governmental official or agency "substantial power to discriminate based on the content or

viewpoint of speech by suppressing disfavored speech or disliked speakers."  Lakewood, 486 U.S.

at 759.  Second, "the law must have a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat of the identified censorship risks."  Id.

This claim mirrors Plaintiff's First Amendment Freedom of Expression claim.  As discussed more fully above, municipalities may require that organizations obtain a permit prior to engaging in expressive activity on public land.  Cox, 312 U.S. at 577.  The provisions of the York Ordinance found to grant city officials too great discretion so as to permit suppression of disfavored speech, have already been found by this Court to be unconstitutional.  The remainder of the York Ordinance is a content-neutral time, place, and manner restriction allowable under the First Amendment.  See Section III(a) supra.  Accordingly, Defendant's motion for summary judgment in this regard will be granted and Plaintiff's overbreadth claim will be dismissed.

    E.    **Freedom of Association**

    In its Complaint, Plaintiff also alleges that the York Ordinance violates its right to freedom of association.[10]  (Doc. No. 1, Count IX.)  Specifically, Plaintiff alleges that "its organizing efforts [have been] hindered, it ability to associate together for the common purpose of recruiting, discussion and advocacy on matters of public interest have been hindered and its efforts to garner support for its agenda have been hampered."  (Doc. No. 1, ¶ 68.)  Again, Plaintiff's claim mirrors its First Amendment Freedom of Expression claim.  Defendant's alleged hindrance is entirely within the context of preventing Plaintiff from rallying on the capital steps without a permit.  Plaintiff alleges no further action taken by Defendant attempts to prevent

---

[10] Although both sides seek summary judgment on all counts of the Complaint, neither side directly briefed this issue.

Plaintiff's members from meeting on private land or associating with each other in any other context.  Accordingly, Defendant's motion for summary judgment in this regard will be granted and Plaintiff's claim will be dismissed.

**F.    Conclusion**

For the reasons discussed above, the Court finds that Article 741 of the Codified Ordinances of the City of York, Pennsylvania, Section 741.03, subsection (d)(7) and subsection (d)(9), violate Plaintiff's First Amendment right to freedom of expression and are therefore unenforceable as written.  The Court finds that the remainder of the ordinance is constitutional on its face and as applied to Plaintiff.  Plaintiff's equal protection, void-for-vagueness, overbreadth, and freedom of association claims will also be dismissed.

IV.    **Order**

**AND NOW**, this 24th day of March, 2006, **IT IS HEREBY ORDERED THAT**

Plaintiff's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

Plaintiff's Motion for Summary Judgment is granted as to Count II of the Complaint.  **IT IS**

**HEREBY DECLARED** that Article 741 of the Codified Ordinances of the City of York,

Pennsylvania, Section 741.03, subsection (d)(7) and subsection (d)(9) are unconstitutional as

written.  In all other respects, Plaintiff's motion is denied.

Defendant's Motion for Summary Judgment is **GRANTED** in part and **DENIED** in part.

Defendant's motion is granted with regard to:  Plaintiff's First Amendment challenges to all

other aspects of the Ordinance; Plaintiff's claims of denial of Equal Protection and Due Process;

and Plaintiff's challenge to the Ordinance as void for vagueness and overbroad.  Accordingly,

Counts I, III, IV, V VI, VII, VIII and IX of the Complaint are **HEREBY DISMISSED**.  In all

other respects, Defendant's motion is denied.  The Clerk of Court is directed to **CLOSE** the file.


            S/ Yvette Kane
            Yvette Kane
            United States District Judge

Dated: March 24, 2006